IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION

| | |
|---|---|
| WILLIE WORLEY, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | Case No. 3:05-0080 |
| ) | |
| PERFECT EQUIPMENT COMPANY, LLC, ) | Judge Thomas A. Wiseman, Jr. |
| ) | |
| Defendant. ) | |

## MEMORANDUM OPINION

Plaintiff Willie J. Worley filed his Complaint in the Chancery Court for Rutherford County, Tennessee on January 11, 2005, alleging that the Defendant, Perfect Equipment Company, LLC ("PEC"), engaged in age-based discrimination when it fired him from his job as a press operator, in violation of the Tennessee Human Rights Act, Tenn. Code Ann. § 4-21-101 *et seq.* Mr. Worley seeks compensatory and exemplary damages in the amount of $500,000. PEC, a Delaware limited liability company, removed the matter to this Court on the basis of diversity jurisdiction on January 31, 2005, and filed an Answer in which it denied liability.

The parties have now completed discovery, and PEC has filed a Motion for Summary Judgment (Doc. No. 10). In support of its Motion, PEC filed a Memorandum of Law (Doc. No. 11), Statement of Undisputed Facts (Doc. No. 13), and various exhibits. Plaintiff has filed his Response in opposition to PEC's motion (Doc. No. 20), a Response to PEC's statement of undisputed facts (Doc. No. 19), Plaintiff's Affidavit (Doc. No. 21), and various exhibits thereto. The motion is ripe for resolution.

For the reasons discussed herein, the Court finds it must deny PEC's Motion based upon the existence of genuine issues of material fact.

## I. STANDARD OF REVIEW

Summary judgment is appropriate "[i]f the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). "[S]ummary judgment will not lie if the dispute is about a material fact that is 'genuine,' that is, if the evidence is such that a reasonable jury could return a verdict for the non-moving party." Anderson v. Liberty Lobby, Inc., 477 U.S.

242, 248 (1986); see Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986) (concluding that summary judgment is appropriate when the evidence could not lead the trier of fact to find for the non-moving party).

In evaluating a motion for summary judgment, the court must view the evidence in the light most favorable to the nonmoving party. Matsushita, 475 U.S. at 587; Wade v. Knoxville Util. Bd., 259 F.3d 452, 460 (6th Cir. 2001). Justifiable inferences based on facts are also to be drawn in favor of the non-movant. Kalamazoo River Study Group v. Rockwell Int'l Corp., 171 F.3d 1065, 1068 (6th Cir. 1999). The movant has the burden of establishing that there are no genuine issues of material fact, which may be accomplished by demonstrating that the non-moving party lacks evidence to support an essential element of his case. Celotex Corp. v. Catrett, 477 U.S. 317, 322–23 (1986); Barnhart v. Pickrel, Schaeffer & Ebeling Co., 12 F.3d 1382, 1388–89 (6th Cir. 1993). Of course, in responding to a motion for summary judgment, the non-moving party "may not rest upon its mere allegations . . . but . . . must set forth specific facts showing that there is a genuine issue for trial." Fed. R. Civ. P. 56(e).

## II. STATEMENT OF FACTS

The following facts are undisputed unless otherwise indicated:

Mr. Worley was hired by PEC in 1966 to work in its shipping department. (Pl.'s Resp. to Def.'s Statement Undisp. Mat. Facts (Doc. No. 19) ¶ 1.) Mr. Worley worked in the shipping department for approximately twenty years before moving to the press department to work as a press operator or set-up press operator. (Doc. No. 19, ¶ 2.) He worked as a press operator for approximately fifteen years before PEC terminated his employment on or about January 30, 2005. (Doc. No. 19, ¶ 3.) Mr. Worley was 62 years old at the time he was fired. (Oct. 31, 2005 Affidavit of W. Worley ("Worley Aff."), Doc. No. 21, ¶ 1.) Darryl Davis was Mr. Worley's direct supervisor at the time of Mr. Worley's termination, and had served in that position for approximately two years. (Doc. No. 19, ¶ 5.)

In his Complaint, Mr. Worley stated that he received separate and conflicting reasons as to why his employment was terminated. (Compl. ¶ 3.) His deposition testimony reveals, however, that the reasons he received were both from Mr. Davis and were not necessarily contradictory. More specifically, Mr. Worley admitted that Mr. Davis told him he was being fired because he produced faulty

parts at a time when he had allegedly been seen reading in the breakroom. (Doc. No. 19, ¶ 40; Deposition of W. Worley ("Worley Dep.") at 39:14 - 41:6.)

More specifically, as a press operator at PEC, Mr. Worley was responsible for running a machine that forges clips that are ultimately used for attaching wheel weights to automotive wheels. (Doc. No. 19, ¶ 6.) The press machine uses a five-hundred-pound die to stamp a piece of metal to form the clips. (Doc. No. 19, ¶ 7.) The press operator places the appropriate steel onto the reel of the machine, depending upon what kind of clip is scheduled to run. (Doc. No. 19, ¶ 8.) The press operator then activates the machine, which then runs, or cycles, stamping out clips. (Doc. No. 19, ¶ 9.) Four clips are stamped out each time the machine cycles. (Doc. No. 19, ¶ 10.) The press cycles about 120 times per minute. (Doc. No. 19, ¶ 11.)

The press operator must constantly monitor the machine's production to make sure that the clips stamped out by the machine are within the required specifications. (Doc. No. 19, ¶ 12.) Monitoring the press is necessary because the components of the machine occasionally break, loosen or fall out of tolerance, which will cause the production of faulty or defective clips. (Doc. No. 19, ¶¶ 13 and 14.) The press operator monitors the machine and corrects any problems that arise. (Doc. No. 19, ¶ 15.) If the press operator fails to perform his job properly, defective, unusable clips may be produced. (Doc. No. 19, ¶ 16.)

On the last day that Mr. Worley worked, January 27, 2004, the press that he was operating began malfunctioning when a cam bolt broke. (Doc. No. 19, ¶ 17.) Although it was Mr. Worley's job to monitor the press and shut it down if it malfunctioned, at the time his machine began producing defective clips, Mr. Worley had left his work station. As a result, the malfunctioning machine produced a certain quantity of unusable or scrap parts before the problem was discovered. (Doc. No. 19, ¶ 18.) The parties dispute the quantity of unusable parts produced and the loss caused to the company as a result. (Doc. No. 19, ¶ 18.) Mr. Worley alleges that only about 50 to 75 pounds of unusable parts were produced, the actual value of which was "less than $10.00." (Doc. No. 19, ¶ 18; Worley Aff. ¶ 7.) The parties agree that the faulty parts and the good parts were mixed together in the bin where they fell, and that the entire contents of the bin had to be scrapped. (Doc. No. 19, ¶¶ 33, 34.) There is no evidence

3

in the record regarding the value of the entire binful of scrapped parts.

Mr. Worley admits that he was not at the press when it began to malfunction and that unsalvageable parts were produced in his absence. (Doc. No. 19, ¶¶ 19, 23.) Further, Mr. Worley admits that he did not inform anyone that he was leaving his machine unattended. (Doc. No. 19, ¶ 24.) According to Mr. Worley, he was in the bathroom for about ten minutes during the time his machine malfunctioned. (Doc. No. 19, ¶ 20.) Mr. Worley alleges that he had suddenly become ill at work and had to go to the bathroom, and that he briefly left his machine for that emergency. (Worley Aff., ¶ 5.) The bathroom is located inside the breakroom, such that Mr. Worley had to pass through the breakroom on his way to and from the bathroom. (Doc. No. 19, ¶ 21; Worley Aff. ¶ 5; Worley Dep. at 20:20–25.)

Darryl Davis, Mr. Worley's supervisor, alleges that Mr. Worley told him that he was in the pressroom (not to be confused with the breakroom) when the machine began malfunctioning.[1] (Nov. 9, 2005 Affidavit of D. Davis ("Davis Aff."), Doc. No. 23, ¶ 3; Jan. 20, 2004 Associate Disciplinary Report (Def.'s Ex. 5).) Mr. Worley, when asked about Mr. Davis's allegations during his deposition, did not deny telling Mr. Davis he was in the pressroom; rather, he stated he did not remember telling Mr. Davis he was in the pressroom. (Worley Dep. at 26:1–7.) According to the Associate Disciplinary Report issued in connection with this incident, Mr. Davis spoke with three eyewitnesses who either told him that Mr. Worley had not been in the pressroom or that they had seen Mr. Worley reading in the breakroom around the time his press began malfunctioning. (Doc. No. 19, ¶¶ 26, 27; Def.'s Ex. 5.) The Report does not identify who these witnesses were. Mr. Worley objects to the eyewitness "reports" as set forth in the Associate Disciplinary Report on the grounds that they constitute inadmissible hearsay. (Doc. No. 19, ¶¶ 27, 29.)[2] Mr. Worley admits, however, that Mr. Davis told him at the time of his termination that Mr. Davis's investigation of the incident revealed that other employees allegedly had seen Mr. Worley in the breakroom reading at the time of the incident. (Doc. No. 19, ¶ 29; Worley Dep. at

---

[1] The Court notes that Mr. Worley's response to PEC's Statement No. 21 is actually not responsive and does not constitute a denial of the Statement. (See Doc. No. 19, ¶ 21.)

[2] Mr. Worley's Response to PEC's Statement of Undisputed Facts appears to be incomplete as it contains several blanks, including one after paragraph 26, to which Mr. Worley did not respond at all. (Doc. No. 19.)

4

30:4–7.)³  Regardless, Mr. Worley denies reading in the breakroom at the time the machine began malfunctioning, though he admits he might have been carrying reading material from the bathroom to place it in the breakroom on his way back to his workstation.  (Doc. No. 19, ¶ 28; Worley Dep. at 21:3–16.)

Mr. Worley was notified of his termination on January 30, 2004 following the January 27 incident.  (Doc. No. 19, ¶ 36.)  The Associate Disciplinary Report signed by Mr. Davis on January 30, 2004 states that the corrective action taken based on Mr. Worley's actions was termination of employment.  (Doc. No. 19, ¶ 37.)  In addition to referencing the alleged eyewitness reports that Mr. Worley was not in the pressroom and that he was reading in the breakroom when his press machine began malfunctioning, the Report also states, "Considering prior warnings and behavior, PEC feels it best to terminate [Mr. Worley's] employment at this time."  (Doc. No. 19, ¶ 39; Def.'s Ex. 5; Davis Aff. ¶¶ 5, 6.)

The Associate Disciplinary Report also noted that Mr. Worley's termination was not the first written disciplinary report he had received.  (Doc. No. 19, ¶ 42.)  In fact, Mr. Worley had received an Associate Disciplinary Report on November 13, 2003 ("November 2003 Report"), just two months prior to his termination, for sleeping while sitting on a five-gallon bucket for fifteen minutes during working hours.  (Doc No. 19, ¶ 44; Def.'s Ex. 6.)  The November 2003 Report, upon which Mr. Worley's signature appears, stated that Mr. Worley had been verbally warned multiple times in the past for sitting and sleeping during work hours, and further specified that the next disciplinary step would be termination.  (Doc. No. 19, ¶¶ 46, 47; Def.'s Ex. 6.)  In his response to PEC's statement of fact, Mr. Worley denied PEC's allegation that the November 2003 Report stated he had been verbally warned in the past for sleeping on the job,⁴ but it appears Mr. Worley actually disputes the allegations that he was sleeping

---

³Despite Mr. Worley's objection, it is not hearsay to state that Mr. Worley acknowledges being told what the investigation about him revealed, as Mr. Worley's own statements are not hearsay.  Fed. R. Evid. 901(d).  Moreover, Mr. Worley's acknowledgment regarding what he was told is not indicative of the truth of what he was told and, although PEC has not responded to Mr. Worley's contentions regarding the admissibility of this hearsay, it appears the Associate Disciplinary Report itself would likely be admissible as a record of regularly conducted activity under Fed. R. Evid. 803(6).

⁴The reference to Mr. Worley's affidavit, cited in support of his "denial" of PEC's statement No. 47, does not include a paragraph number.

5

on the job. (See Worley Aff. ¶ 6.) Regardless, it is indisputable that the November 2003 Report contains the referenced statement and that Mr. Worley acknowledged receipt of the Report by signing it. (Def.'s Ex. 6.) Moreover, he admits that he was sitting on the bucket with his eyes closed *and* that he had previously been warned about sitting down and appearing to be asleep. (Worley Dep. at 32:7–11.) He claims the problem was related to the fact that he was taking medication at that time that made him drowsy, and after the reported incident, he stopped taking that medication before work. (Worley Aff. ¶ 6.)[5]

PEC justifies its termination of Mr. Worley, in part, on the fact that both incidents for which he received written Reports allegedly constituted "major" offenses as defined in the associate handbook. (Doc. No. 19, ¶ 60.) PEC has introduced evidence showing that it periodically updated and distributed associate handbooks that include PEC's Standards of Conduct. (Doc. No. 19, ¶ 57.) The Standards of Conduct lists "minor" and "major" offenses. (Doc. No. 19, ¶ 59.) Mr. Worley admits signing forms saying he had received, read and understood the associate handbooks distributed by PEC in 2000 and 2002. (Doc. No. 19, ¶ 58.) Mr. Worley denies that the offenses for which he was disciplined constituted "major" offenses, since "the same reports also describe the alleged [offenses] as 'minor.'" (Doc. No. 19, ¶ 60.) In fact, the Standards of Conduct list of "Minor Offenses" "which could result in disciplinary action" includes "negligent and careless work which causes excessive scrap" and "loafing or other abuse of time during work hours" as "minor offenses." (Def.'s Ex. 5.) The list of "Major Offenses," which are considered severe and might result in immediate termination without warning, includes "giving a false reason for an unexcused absence," and "[l]oafing, lounging or sleeping during work time . . . without permission." (Def.'s Ex. 5.) It is therefore unclear whether Mr. Worley's offenses should have been considered minor or major offenses.

When asked whether he has any direct evidence that he was terminated as a result of age discrimination, Mr. Worley has admitted that he does not (Doc. No. 19, ¶ 61; Worley Dep. at 34:22 -

---

[5]The November 2003 Report also references the fact that in September 2003, all the chairs were removed from the pressroom. (Def.'s Ex. 6.) In its Memorandum in support of summary judgment, PEC claims that it took the measure of removing the chairs from the pressroom to prevent Mr. Worley from sitting down and falling asleep on the job (see Doc. No. 11 at 5), but that claim is not supported by the evidence in the record except, perhaps, by intimation. Mr. Worley did acknowledge in his deposition that the chairs in the pressroom had been removed. (Worley Dep. at 32:12–20.)

6

35:4), other than the fact that he had been asked by a supervisor a time or two whether he had thought of retiring. (Worley Dep. at 35:5–16.) Mr. Worley contends, however, that the circumstantial evidence in support of a finding of age discrimination is sufficient that a jury could reasonably find in his favor on his claim of age discrimination. The circumstantial evidence to which Mr. Worley points includes the following:

> (1) Mr. Worley worked at the company for 38 years, 22 years of it with perfect attendance, and never had any serious disciplinary problems during his entire work history (Worley Aff. ¶¶ 2, 3);
>
> (2) his personnel file generally reflects good skills as a press operator and only three minor disciplinary issues during his entire 38 years with the company, including a smoking infraction in 1997, his warning for allegedly sleeping on the job in November 2003, and his termination in January 2006 (Worley Aff. ¶ 7);
>
> (3) one of the purported reasons for Mr. Worley's termination, that he was reading in the breakroom without authorization, is untrue, and no witnesses have come forward from PEC to support the allegation that there were eyewitnesses who saw him sleeping (Worley Aff. ¶¶ 4, 5);
>
> (4) the other reason given for his termination, that he produced an unacceptable number of faulty parts that had to be scrapped, has "never been a reason" for termination of any other press operator of whom he knows, since all press operators occasionally produce bad parts (Worley Aff. ¶¶ 4, 7 (listing other operators who allegedly had been disciplined but not fired for a first instance of producing excessive faulty parts, even where a much greater quantity of parts were scrapped as a result of the employee's negligence, at much greater cost to PEC));
>
> (5) the "disciplinary" action taken in November was insignificant because it was not true that he was sleeping; rather he was simply resting his eyes. Further, he told his supervisor at the time that he was taking medication that made him drowsy; and he immediately stopped taking the medication before work after being admonished in November (Worley Aff. ¶ 5);
>
> (6) the company's attitude toward him allegedly changed dramatically after Mr. Worley and his wife both started having health problems in 1999 that resulted in significant costs to the company and temporary absenteeism on the part of Mr. Worley;
>
> (7) he was replaced by a person who was approximately 30 years old (Worley Aff. ¶ 9(g)); and
>
> (8) he never was subjected to progressive discipline, as allegedly required by the employee handbook (Worley Aff. ¶ 9(e), citing to Employee Handbook, Standards of Conduct). (The Court notes, however, that the referenced section of the Standards of Conduct included as an exhibit to Mr. Worley's affidavit, in support of this statement, refers to excessive absenteeism, and disciplinary action associated therewith. (See Worley Aff., Ex. D.))

### III. DISCUSSION AND ANALYSIS

The Tennessee Human Rights Act, Tenn. Code Ann. § 4-21-401, prohibits an employer from discriminating in hiring and firing on the basis of age. The THRA's prohibitions against age discrimination apply to individuals who are at least forty years of age. Tenn. Code Ann. § 4-21-407(b). It is undisputed that Mr. Worley was 62 when his employment with PEC was terminated, so he is clearly a person protected by the statute.

In applying and interpreting the THRA, Tennessee courts look to cases construing the federal "Age Discrimination in Employment Act," 29 U.S.C.A. § 621 *et seq.* ("ADEA"), because the Tennessee legislation specifically states,"It is the purpose and intent of the general assembly by this chapter to . . . [p]rovide for execution within Tennessee of the policies embodied in the . . . Age Discrimination in Employment Act of 1967, as amended." Tenn. Code Ann. § 4-21-101(a); Moore v. Nashville Elec. Power Bd., 72 S.W.3d 643, 651 (Tenn. Ct. App. 2001); Bruce v. Western Auto Supply Co., 669 S.W.2d 95, 97 (Tenn. Ct. App. 1984).

Thus, under both the THRA and the ADEA, a plaintiff seeking to establish a claim of age discrimination must first prove a *prima facie* case of discrimination. Tex. Dep't of Comm. Affairs v. Burdine, 450 U.S. 248, 252–53 (citing McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802 (1973)); Moore, 72 S.W.3d at 651; Bruce, 669 S.W.2d at 97. If the plaintiff establishes a *prima facie* case, the burden then shifts to the defendant to "articulate some legitimate, nondiscriminatory reason for the employee's rejection." Burdine, 450 U.S. at 253 (quoting McDonnell Douglas, 411 U.S. at 802). If the defendant carries that burden, the plaintiff must prove that the proffered reasons were pretextual. Id. (citing McDonnell Douglas, 411 U.S. at 804). Pretext can be established by a direct showing that a discriminatory reason more likely motivated the employer or by an indirect showing that the employer's explanation is not credible. Id. at 256.

An employee "may establish a *prima facie* case of discrimination either by presenting direct evidence of intentional discrimination by the defendant, or by showing the existence of facts which create an inference of discrimination." Talley v. Bravo Pitino Restaurant, Ltd., 61 F.3d 1241, 1248 (6th Cir. 1995) (internal citations omitted). Where no direct evidence is available, the Plaintiff may establish his *prima facie* case with indirect, circumstantial evidence by showing that (1) he is a member of a

protected group; (2) he was subject to an adverse employment decision; (3) he was qualified for the position; and (4) he was replaced by a person outside the protected class. Id. at 1246; see also Kline v. TVA, 128 F.3d 337, 349 (6th Cir. 1997).

In this case, Mr. Worley succeeds in establishing a *prima facie* case of discrimination: At age 62 when he was fired, he was a member of a protected group and he underwent an adverse employment action; he was qualified for the job, having worked at it for about fifteen years, and, according to his allegations, which PEC has not refuted, he was replaced by someone much younger than he. Accordingly, "[t]he burden . . . shift[s] to [PEC] to produc[e] evidence that the plaintiff was rejected, or someone else was preferred, for a legitimate, nondiscriminatory reason. This burden is one of production, not persuasion; it can involve no credibility assessment. " Reeves v. Sanderson Plumbing Prods., Inc., 530 U.S. 133, 142 (2000) (internal quotation marks and citations omitted).

PEC, likewise, meets its burden by alleging that Mr. Worley was absent from his workstation, without authorization, and that a certain quantity of defective parts was produced and had to be scrapped as a result of his unauthorized absence. In addition, Mr. Worley had been written up just two months prior to this incident for allegedly falling asleep on the job, and the incident report generated at that time indicated that the next action would be termination. Because PEC has proffered a legitimate, non-discriminatory reason for firing Mr. Worley, the burden shifts back to Mr. Worley to show that the reasons articulated by PEC for firing him are pretextual.

In order to demonstrate pretext at the summary judgment stage, a "plaintiff must produce sufficient evidence from which the jury could 'reasonably reject the defendant's explanation' and infer that [defendant] 'intentionally discriminated' against him." Leonard v. Towers, No. 99-4221, 6 Fed. Appx. 223, 228 (6th Cir. Mar. 1, 2001) (citing St. Mary's Honor Ctr. v. Hicks, 509 U.S. 502, 519 (1993)). As the Sixth Circuit has recognized, "a plaintiff's *prima facie* case, combined with sufficient evidence to find that the employer's asserted justification is false, may permit the trier of fact to conclude that the employer unlawfully discriminated." Id. (quoting Reeves v. Sanderson Plumbing Prods., 530 U.S. 133, 148 (2000)). Further, pretext may be proven by showing (1) the defendant's reasons had no basis in fact; (2) the proffered reasons did not actually motivate the defendant; or (3) the proffered reasons were

9

not sufficient for the defendant to act as it did.  Kline, 128 F.3d at 346.  When proving pretext by the first or third method, discrimination may be inferred from the circumstances.  Id.

While the Court finds that the factual record produced by both parties in this case is rather scanty, Mr. Worley has nonetheless produced sufficient evidence in support of his claim of pretext that a jury could find in his favor.  First, a reasonable jury could find that PEC's reason for firing him had no basis in fact because Mr. Worley was on an "emergency" bathroom break and was not reading in the breakroom at the time his press machine began malfunctioning.  As Mr. Worley points out, PEC has not produced affidavits from the person or persons who allegedly saw him reading in the breakroom.  Second, a reasonable jury could find that PEC's proffered reasons for firing Mr. Worley were not sufficient to justify the action taken.  In support of this argument, Mr. Worley points out that he worked at the company for 38 years, during which time he was cited for a total of three minor disciplinary infractions.  He also raises a factual issue as to the value of the parts that had to be scrapped as a result of his unauthorized absence from his work station:  He alleges the value to the company was approximately $10, which PEC has not disputed.  He further claims that PEC did not follow its own policies with regard to "progressively" disciplining him, and that other, younger employees merely received warnings or were temporarily suspended when they were involved in more serious infractions causing substantially greater financial loss to the company.  While the portion of the employees' handbook to which Mr. Worley points does not entirely support his argument, since it pertains specifically to absenteeism, it does suggest a company policy of progressive discipline, which PEC has not refuted.  Mr. Worley also points out that there is a factual dispute as to whether either of his infractions should have been considered a "major" infraction.  Finally, with respect to November 2003 Report for allegedly sleeping on the job, Mr. Worley claims that he explained to his employer at the time that he was on medication that made him drowsy and that he immediately stopped taking that medication before work, which cured whatever problem may have existed.

Again, while Mr. Worley's evidence is somewhat thin in that it consists largely of his own self-serving allegations, PEC has not contested those allegations and a jury might choose to credit them.  Cf. Manzer v. Diamond Shamrock Chemicals Co., 29 F.3d 1078, 1083 (6th Cir. 1994) ("The factfinder's
10

Case 3:05-cv-00080   Document 24   Filed 11/14/05   Page 10 of 11 PageID #: 162

disbelief of the reasons put forward by the defendant . . . may, together with the elements of the *prima facie* case, suffice to show intentional discrimination. Thus, rejection of the defendant's proffered reasons, will *permit* the trier of fact to infer the ultimate fact of intentional discrimination[.]"). Consequently, the Court finds that Mr. Worley has carried his burden of creating a genuine issue of material fact as to whether PEC's reasons for firing him were pretextual.

## IV. CONCLUSION

As set forth above, the Court finds that Mr. Worley has carried his burden of establishing a *prima facie* case of discrimination and has shown that there are genuine issues of disputed fact as to whether PEC's proffered reasons for firing him were pretextual. Therefore, PEC is not entitled to summary judgment and its motion must be denied. An appropriate order will enter.

This the 14th day of November, 2005.

Thomas A. Wiseman, Jr.
Senior U.S. District Judge